# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TINA HENDERSON,**

                  **Plaintiff,**

**-vs-**                                 **Case No. 6:06-cv-1178-Orl-UAM**

**COMMISSIONER OF SOCIAL
SECURITY,**

                  **Defendant.**

_____

## MEMORANDUM OF DECISION

      Plaintiff Tina Henderson ["Henderson"] appeals to the district court from a final decision of

the Commissioner of Social Security [the "Commissioner"] denying Henderson's application for a

period of disability and disability insurance benefits. *See* Docket No. 1 (complaint). For the reasons

set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

      On May 31, 2001, Henderson filed her initial claim for disability insurance benefits, claiming

disability as of May 14, 2001. R. 88. On April 24, 2003, the Honorable Philemina M. Jones,

Administrative Law Judge ("ALJ") issued an Unfavorable Decision ("First Unfavorable Decision").

On appeal to the District Court, the District Court reversed and remanded for further action. R. 413.

Pursuant to the Court's order, the Appeals Council remanded the case to the ALJ. R. 419.

      On October 26, 2005, after conducting additional proceedings, the ALJ again issued an

Unfavorable Decision ("Second Unfavorable Decision"). R. 367. Following a review of the medical

and other record evidence, the ALJ found that Henderson could not perform her past relevant work as a nurse's assistant.  R. 377; R. 379, Finding 7.  The ALJ found that Henderson nevertheless retained the residual functional capacity ["RFC"] to perform a significant range of sedentary work.  R. 379, Finding 11.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Henderson was not disabled.  R. 379, Finding 12.

On June 6, 2006, the Appeals Council again denied further review of the claim.  Docket 1. Henderson's complaint based on the Second Unfavorable Decision was timely filed on August 8, 2006.  *Id*.  On February 2, 2007, Henderson filed in this Court a memorandum of law in support of her appeal.  Docket No. 17.  On April 2, 2007, the Commissioner filed a memorandum in support of his decision that Henderson was not disabled.  Docket No. 18.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Henderson assigns two errors to the Commissioner.  First, Henderson claims that the Commissioner erred in rejecting medical opinions by Henderson's treating physicians.  Second, Henderson claims that the Commissioner erred by discounting the credibility of her testimony.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ properly rejected medical opinions that were inconsistent with the evidence or were conclusory.  Second, the Commissioner argues that the ALJ properly evaluated Henderson's subjective pain complaints.

### III.   **THE STANDARD OF REVIEW**

#### A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards,* 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

#### B.   **REVERSAL**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405(g)(Sentence Four).  The district court will reverse a

-3-

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Serv.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir.

1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon*

*v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health & Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id.*

## V.   APPLICATION AND ANALYSIS

### A.   THE FACTS

On September 5, 2000, Henderson went to the emergency room at Florida Hospital Altamonte with complaints of "left precordial chest pain that has been off and on associated with shortness of breath and nausea." R. 139, 142. She was asymptomatic in the ER, but was noted to have very high blood pressure. R. 142. The medical consultation plan recommended by her primary care provider, Ahmadi B. Zaman, M.D., was to rule out myocardial infarction, continue medications, and to perform a treadmill stress echocardiogram to rule out significant coronary artery disease. R. 143.

On September 6, 2000, Henderson's cardiologist, Amish M. Parikh, M.D., performed a treadmill stress echocardiogram on Henderson at Florida Hospital Altamonte. R. 140. Dr. Parikh's impression was that Henderson had average exercise capacity; no evidence of ischemia or chest pain; at peak stress she had appropriate augmentation of the left ventricular cavity with a decrease of left ventricular size; and she had no new wall motion abnormalities. R. 141. On September 8, 2000,

Prafulla K. Kirtane, M.D., performed an esophago-gastroduodenoscopy and biopsy, which examination revealed a normal esophagus. R. 157.

Because of Henderson's recurrent angina, on September 12, 2000, Dr. Parikh performed a left heart catheterization. R. 154 - 55. This was her first heart catheterization. The procedure revealed moderate one-vessel coronary artery disease with severe coronary vasospasm of the proximal mid segment of the right coronary artery. R. 155. Dr. Parikh also noted diffuse endothelial dysfunction in the right coronary artery. R. 155. Henderson suffered chest pain during the procedure, which was relieved after she was given intracoronary nitroglycerin. Dr. Parikh recommended a plan of treatment to include decreased anxiety, use of nitroglycerin, Imdur, and calcium channel blockers. R. 156.

On December 9, 2000, Henderson was again admitted to Florida Hospital Altamonte, this time with chest pains, chronic diarrhea and weight loss after a three to four week period of such symptoms. R. 159. After Henderson's September hospitalization, Dr. Zaman had placed her on "as needed" nitroglycerin, but she began having chest pain on a daily basis, with particularly severe chest pain on the day of her hospitalization. R. 171. Dr. Zaman's primary medical impression was "crescendo angina, history of one vessel disease with severe vasospasm." R. 173.

While hospitalized, Henderson underwent further cardiac testing, including a two-dimensional echocardiogram and a treadmill stress test. R. 159. The echocardiogram indicated a normal left ventricle with systolic function well preserved, and a left ventricular ejection fraction of about 57 percent. R. 160. There also was no evidence of mitral valve prolapse. R. 159. Henderson also underwent a colonoscopy, which revealed mild proctitis and a spastic colon with diverticulosis.

R. 159.  She was discharged on December 12, 2000, with a diagnosis that included "coronary artery disease with unstable angina."  R. 159.

In February of 2001, Dr. Zaman issued an undated work restriction letter stating that Henderson suffered from "Prinzmetal angina."  Dr. Zaman advised that Henderson should remain off work for one week starting February 26, 2001, and on light duty for the next week pending a further decision on her medical management.  R. 218.  On April 23, 2001, Dr. Zaman reported that Henderson "continues with chest pain — needs 2 - 3 NTG frequently. . . had to take 2 this a.m."  R. 220.

On May 15, 2001, Henderson again underwent a cardiac catheterization at Florida Hospital Altamonte.  She had called Dr. Parikh's office that day with complaints of crescendo angina that had worsened over the weekend, leading her to take more than 12 nitroglycerin tablets.  R. 182.  Upon Dr. Parikh's initial catheter engagement with her right coronary artery, the artery underwent "diffuse vasospasm."  R. 180.  Dr. Parikh's impressions were "severe coronary vasospasm of the entire right coronary artery; severe stenosis of the proximal right coronary artery."  R. 181.  He indicated that Henderson was a candidate for coronary angioplasty with stenting.  R. 181.  On October 21, 2001, Henderson's husband called Dr. Zaman to report an increase in spasms that had moved to her left shoulder on that day.  R. 215.

On January 16, 2002, a state agency disability adjudicator reported contact with Dr. Parikh, and that Dr. Parikh had opined that Henderson "should be capable of sustained standing/walking for 2 hours in an 8 hour day."  R. 268.  On January 17, 2002, a Physical Residual Functional Capacity Assessment was completed by a nonexamining, nontreating physician, who concluded that Henderson's allegations were "consistent and credible."  R. 207.  Henderson's health insurance

changed, which required her to change to a new primary care physician, Jewell Geddie, M.D.  R. 211.
On April 5, 2002, Dr. Geddie noted that, despite taking one sublingual nitroglycerin tablet daily,
Henderson regularly suffered chest pain that required her to take additional nitroglycerin.  R. 211.

On July 1, 2002, Mahendra B. Shah, M.D., a psychiatrist, diagnosed Major Depression,
Recurrent Type, with a Global Assessment of Functioning of 45 upon evaluation and 50 in the past
year.  R. 257.

On July 17, 2002, Henderson underwent a cardiac evaluation by C. Richard Conti, M.D. and
Amy M. Eversole, M.D. at Shands Healthcare in Gainesville.  R. 259 - 262.   This evaluation
confirmed the prior diagnoses of coronary vasospasms, primarily based upon a catheterization report
of June 10, 2002, and confirmed that Henderson's ongoing treatment with nitrates and calcium
channel blockers was appropriate.  R. 261-62.  Henderson also reported that she had a 20 year history
of smoking one to one and one-half packs of cigarettes a day, but had stopped smoking two months
ago with no improvement of her chest pain.  R. 260.  Her hypertension of seven years was well
controlled with medication.  *Id.*  Henderson reported symptoms of shortness of breath.  R. 261.  No
functional limitations or restrictions were recommended by these physicians.

On August 8, 2002, Dr. Geddie noted that Henderson had been seen at Shands for a second
opinion on her coronary vasospasms, and they had nothing more to offer.  R. 320.  Henderson
occasionally has vasospasms that may occur 7-10 hours and are unpredictable.  Dr. Geddie stated
Henderson was unable to work secondary to "c.p." [cardio pulmonary].  *Id.*

On August 20, 2002, Dr. Parikh completed a physician questionnaire provided by the Division
of Disability Determinations.  Dr. Parikh described Henderson's chest discomfort as non-ischemic,

-9-

arising from a "severe vasospasm of [her] coronary artery." R. 264.  Dr. Parikh was asked "[h]ow is the patient's ability to function (i.e., ability to sit, stand, walk, lift, carry, travel, and socially interact)" affected by [her] condition?"  Dr. Parikh responded:  "severely, limiting work, activity + even sleep." R. 264.

In February 2003, Dr. Parikh completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) and opined that Henderson's ability to sit, stand and walk was not affected by her impairments.  R. 343-44.  Dr. Parikh also opined that Henderson could occasionally lift and carry ten pounds, balance, kneel, crouch, crawl, stoop and perform limited pushing and pulling with the upper and lower extremities, and occasionally reach, handle, finger and feel.  R. 344-45. Dr. Parikh concluded that Henderson's severe coronary vasospasms were worsened "by many activities especially stress and exercise."  R. 346.  He recommended that she not work.  *Id*.

During the first hearing before the ALJ on February 3, 2003 (R. 22 - 53), Henderson testified that she no longer drives due to her vasospasms.  R.26.  She said that she had not worked since May 14, 2001.  R. 28.  She testified that she had lost feeling in her left arm due to the spasms, and that her doctor, who had been giving her cortisone shots into the shoulder, felt that the muscles "were deteriorating from so many vasospasms."  R. 28 - 29.  She stated that she takes up to eight nitroglycerin tablets a day, and that she suffers vasospasms "almost daily."  R. 29.  She said that, when a spasm occurs, she gets a crushing pain in her chest, gets nauseated, starts sweating, and the pain goes down her left arm to her fingers.  R. 29.  She testified that she "can't function" while she suffers a vasospasm, and that she is forced to lie down wherever she might be.  R. 30.

-10-

Henderson also testified that she has vasospasms even while using the nitroglycerin patch. R. 31. She said that some of her spasms last five minutes, while others may continue for an entire day. R. 32. She said that her cardiologist, Dr. Parikh, has told her that there is nothing that they can do other than keep her on her medications because her condition is rare. R. 34. She testified that she was fired from her job in May 2001 because she was calling in sick too often, because she was caught taking nitroglycerin on the job, and because other employees had had to drive her home because of spasms. R. 36. She testified that, as of the hearing date, neither her cardiologist nor her primary care physicians had yet released her back to work. R. 37. She said that she had had a vasospasm three days prior to the hearing and, after taking nitroglycerin, had fallen down the stairs because the nitroglycerin affects her balance. R. 38.

Henderson testified that she does not do the laundry, but can take a bath, and that she no longer takes showers because she has had vasospasms while showering. R. 39. Though she is left-handed, she said she cannot lift any heavy objects with her left arm, but can lift a glass of water. R. 39 - 40. Overall, she said she can lift less than 10 lbs, and cannot lift anything with her left arm. R. 42. She said that she suffers chest pain whether she is exerting herself or not, and that she is sometimes awakened by chest pains. R. 42. She understands that she is supposed to be seen at a hospital if the pain requires her to take three nitroglycerin tablets or more, but believes "there's really nothing they can do for me" and does not "run to the emergency room" every time she has a vasospasm. R. 43.

On April 8, 2003, Dr. Parikh wrote a letter stating that "even simple activities such as walking or standing are compromised when having a vasospastic attack." R. 347. He opined that Henderson was significantly affected in normal, routine activities and would benefit from full disability. R. 347.

On April 16, 2003, Dr. Geddie wrote a letter in which she stated that Henderson suffered from multiple medical problems, primarily cardiac. R. 348. Dr. Geddie opined that Henderson was unable to work. *Id*.

Henderson was treated by Ahmad Zaman, M.D. for the period of September 3, 2003, through June 21, 2005. R. 428-442. On September 3, 2003, Henderson complained to Dr. Zaman of chest pain. R. 442. Dr. Zaman noted Henderson was on high dosages of Imdur and Cardizem, and refilled her prescriptions for those medications. *Id*. His impressions were Prinzmetal Angina, insomnia, and colonic spasms. *Id*. (R. 442) On October 1, 2003, Zaman noted that Henderson continued to have spasms on high doses of Imdur. R. 441. Dr. Zaman noticed swelling of her feet, and Henderson complained of pain in her left ankle on ambulation. *Id*. Dr. Zaman noted that Henderson's taking Novasc may be causing her edema, but that she did not want to change medications. *Id*. Dr. Zaman noted the possibility of a podiatrist referral.

On November 3, 2003, Dr. Zaman noted that Henderson continued to have chest pains on and off even while taking medication. R. 440. Henderson complained of on and off tingling and numbness in her left arm, and on and off swelling of her fingers. *Id*. An EMG of her left arm was ordered. *Id*. Henderson also complained of swelling in her extremities, especially around the ankles when she was "up and around." *Id*. On February 4, 2004, Henderson continued to complain of left arm pain and that she was unable to get the EMG done. R. 439. Henderson stated that she noticed pedal edema if she sits in front of the computer for a long period of time. *Id*. Dr. Zaman's impression at this time was hypercholesterolemia and pedal edema. *Id*. She was advised to keep her feet elevated. *Id.*

On April 6, 2004, Henderson complained of increased menstrual pain, epigastric pain, and chest pain. R. 438. He noted that Henderson was using nitroglycerin as needed and was on a nitro patch. *Id*. Dr. Zaman noted on June 30, 2004, that Henderson had recently been hospitalized with heart palpitations and an increased temperature, and that she had experienced heart palpitations since the hospitalization. R. 437. He noted that she was trying to decrease use of cigarettes. *Id*.

On September 16, 2004, Henderson complained of increased anxiety and that she was trying to quit smoking. R. 436. Dr. Zaman observed her tachycardia and increased blood pressure during her office visit. *Id*. On October 7, 2004, Dr. Zaman noted that Henderson reported she had "blacked out at home few days ago," and that she was "dizzy even sitting down [and with] ambulation or laying down." His impression was "near syncope. R. 435.

On November 15, 2004, Dr. Zaman referred Henderson to Dr. Parikh to check her regarding "SVT" [supraventricular tachycardia]. R. 432. On December 3, 2004, Dr. Zaman refilled Henderson's nitroglycerin 0.4 mg as needed for chest pains. R. 431.

On January 10, 2005, Henderson complained of pain in her right heel due to sitting in front of the computer for long hours. R. 430. Dr. Zaman diagnosed right Achilles tendon tenderness, Prinzmetal angina and depression. *Id*.

On January 17, 2005, CT scans of Henderson's chest were reported as normal. R. 430.

Dr. Zaman next saw Henderson on June 21, 2005. R. 428. Dr. Zaman noted that she was having a hard time getting medications because of no insurance coverage; she could not buy nitroglycerin, Imdur or Norvasc; and she was having increased chest pains and on and off pain on the left side of her neck that radiated to her left shoulder. R. 428.

-13-

Dr. Amish Parikh completed a Cardiac RFC Questionnaire on June 30, 2005.  R. 443-47.  He stated he had been treating Henderson for five years, and averaged 2-3 visits per year.  R. 443.  (The administrative record contains no records of Dr. Parikh's treatment of Henderson after February 2003.) He diagnosed Henderson with Class IV angina, as supported by cardiac catheterizations in 2000 and 2003 that showed coronary vasospasms; that she experienced symptoms of chest pain, anginal equivalent pain, shortness of breath, fatigue, weakness, edema, palpitations, and dizziness.  *Id*. Henderson's pain was described as severe with exertion (this would include walking) and at rest in the left chest/neck/arm, with positive diaphoresis and dizziness, which pain was sometimes resolved with nitroglycerin.  R. 444.  Dr. Parikh responded "yes" to the question whether Henderson had marked limitations of physical activity, as demonstrated by fatigue, palpitation, dyspnea or anginal discomfort on ordinary physical activity.  *Id*.  He opined that Henderson was incapable of even low stress jobs as she was symptomatic in stress free situations.  *Id*.  Dr. Parikh found that Henderson was depressed secondary to her cardiac issues and required a selective serotonin reuptake inhibitor (SSRI) medication (e.g., Zoloft), and that her symptoms were severe enough to cause frequent interference with her concentration and attention.  R. 444-45.  Dr. Parikh opined that Henderson was physically unable to work, but if required to work, she was limited to sitting 30 minutes at a time before needing to get up, limited to standing 30 minutes at a time, she would need unscheduled breaks every 30 minutes and would need to rest for the remainder of the day.  R. 446.  With prolonged sitting, Henderson's legs would have to be elevated above her heart 75% of the time.  *Id*.  Dr. Parikh expected absences from work in excess of four days per month because of her condition.  R. 447.

On August 30, 2005, Dr. Zaman completed a Medical Source Statement (Physical).   R. 449-52.  He stated that Henderson was unable to perform any lifting, and that she cannot stand for more than 2-3 minutes and then needed to elevate her right leg.  R. 449.  Dr. Zaman further opined that Henderson had to periodically alternate between sitting and standing to alleviate pain or discomfort; and that she was limited in both her upper and lower extremities, but he did not describe the nature or degree of limitation.  R. 450.  Dr. Zaman further stated that Henderson was limited to "frequent" reaching, handling, fingering, and feeling.  R. 451.  He noted that Henderson has severe chest pains with minimal exertion, was left-handed and her arthritis in her left shoulder created muscle pains.  *Id*. She had no visual or communicative limitations.  *Id*.

B.   **THE ANALYSIS**

1.   **The ALJ's Discounting of the Opinions of Treating Physicians**

Henderson complains that the ALJ improperly rejected supplemental medical opinions of Dr. Parikh and the opinions of Dr. Geddie and Dr. Zaman.  Each of these doctors were treating physicians.

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Comm'r of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical

-15-

and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### a.      Dr. Parikh's Supplemental Opinions

The ALJ gave "significant weight" to Dr. Parikh's opinion at R. 343. R. 376. This opinion, rendered in February 2003, stated that Henderson's ability to sit, stand and walk was not affected by her impairments. R. 343-44. Dr. Parikh also opined that Henderson could occasionally lift and carry ten pounds, balance, kneel, crouch, crawl, stoop and perform limited pushing and pulling with the upper and lower extremities, and occasionally reach, handle, finger and feel. Dr. Parikh concluded that Henderson's severe coronary vasospasms were worsened "by many activities especially stress and exercise." R. 346. The ALJ found this opinion was more consistent with the evidence of record when considered in its entirety. R. 376.

In an undated letter submitted on May 30, 2003, Dr. Parikh sought to clarify his earlier opinion.  R. 349-51.  Dr. Parikh stated that although he previously indicated no limitations with respect to standing or walking, he did note that Henderson's condition was worsened by many activities, including stress and exercise.  R. 351. Dr. Parikh then opined that Henderson's ability to stand and walk was limited by her condition, and that she would be severely limited in those activities "while she is having a coronary vasospasm episode."  R. 351.  The ALJ rejected Dr. Parikh's clarification as a conclusion on an issue reserved for the Commissioner.  R. 376.

The Court disagrees with the ALJ that Dr. Parikh's clarification was a conclusion reserved on an issue for the Commissioner.  He does not, for example, opine that Henderson was disabled. Instead, the clarification is restricted to his opinion regarding Henderson's physical limitations.  The Court finds, however, that Dr. Parikh's clarified opinion regarding Henderson's limitations is conclusory.  Although he states that Henderson's ability to stand or walk is limited, he fails to describe the nature of the limitations except when she is experiencing a vasospasm episode.  Further, in reference to Dr. Parikh's first opinion, which the ALJ found was more consistent with the evidence, the ALJ implicitly rejected Dr. Parikh's clarification as being unsupported by the medical record.  The Court, therefore, finds no error by the ALJ in rejecting Dr. Parikh's clarification letter.

The ALJ also rejected Dr. Parikh's June 30, 2005, assessment of Henderson's condition as not being supported by the evidence of record, or explaining the basis for the difference in severity of limitations between his three opinions.  R. 376.  The medical record does not indicate that Dr. Parikh treated or examined Henderson in 2004 or 2005.  The record is devoid any of any medical reports, treatment notes or consultative reports from Dr. Parikh after his February 6, 2003, letter,

-18-

except for the June 2005 functional assessment.  Because the record contained no objective clinical, diagnostic or laboratory findings dated after February 6, 2003, it was permissible for the ALJ to reject Dr. Parikh's 2005 assessment.

### b.   Dr. Geddie's and Dr. Zaman's Opinions

Dr. Geddie and Dr. Zaman were Henderson's internal medicine doctors.  Henderson complains that the ALJ failed to discuss any of Dr. Geddie's medical records in her decision, but merely dismissed Dr. Geddie's opinion of April 16, 2003 (R. 348), because it usurped an issue reserved to the Commissioner.  R. 376.  The only record of Dr. Geddie's treatment of Henderson, however, was a new patient examination on April 5, 2002, with the purpose of the visit being Henderson's weight gain.  R. 211-12.  Although Henderson informed the doctor of her cardiovascular history, Dr. Geddie did not conduct any testing to diagnose her condition.  Upon physical examination, Dr. Geddie found Henderson to be alert and oriented times 3, her gait was normal, her deep tendon reflexes were 2+, her grip was 5/5, strength 5/5 and tone normal.  R. 212.

Dr. Geddie's April 16, 2003 opinion stated little more than Henderson was unable to work and was completely disabled by unspecified medical problems.  There is "no rigid requirement that the ALJ specifically refer to every piece of evidence" in the decision, so long as the decision shows enough to conclude that the ALJ considered the claimant's condition as a whole.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).  The Court is persuaded that the ALJ considered Henderson's condition as a whole.  Further, there is no objective medical evidence in the one medical record prepared by Dr. Geddie that supported her conclusory statement that Henderson was unable to work.

The ALJ appropriately rejected Dr. Geddie's opinion as a conclusion that is reserved for the Commissioner.

The ALJ also rejected Dr. Zaman's opinion of August 30, 2005, that Henderson cannot lift, cannot stand for more than 2-3 minutes, that she had to periodically alternate between sitting and standing, was limited posturally, and was limited in manipulative functions. R. 449-52. The basis for the ALJ's rejection of Dr. Zaman's opinion was that it was inconsistent with his own treatment notes at Exhibit 20F and with the limitations set forth by Dr. Parikh. R. 376. Henderson complains that the ALJ failed to provide explicit and adequate reasons as to how Dr. Zaman's opinion was inconsistent with this other evidence.

As to an inconsistency with Dr. Parikh's credited opinion, the difference is obvious. Whereas Dr. Parikh opined that Henderson's ability to sit, stand and walk was not affected by her impairments (R. 343-44), Dr. Zaman's opinion that she was limited to standing for 2-3 minutes at a time is markedly different. Further, where Dr. Parikh opined that Henderson could occasionally lift and carry ten pounds, balance, kneel, crouch, crawl, stoop and perform limited pushing and pulling with the upper and lower extremities, and occasionally reach, handle, finger and feel, Dr. Zaman's opinion that she could not lift at all, could not crouch, bend, stoop, and was limited in her manipulative functions also are very different from Dr. Parikh's opinion.

Whether Dr. Zaman's opinion was inconsistent with his own treatment notes is more difficult to discern. Exhibit 20F comprises Dr. Zaman's notes of his treatment of Henderson from September 3, 2003, to June 21, 2005. R. 428-42. As described in more detail above, during this time period, Henderson complained to Dr. Zaman regarding chest pain, pedal edema when sitting for long periods

of time, pain in her left ankle on ambulation, on and off tingling and numbness in her left arm, on and off swelling of her fingers, swelling in her extremities, especially around the ankles when she was "up and around," left arm pain, tachycardia, increased blood pressure.  The notes do not support the strict limitations of no lifting and no standing for more than 2-3 minutes.  Nor do they support the level of limitations imposed upon her manipulative functions.  Considering the record as a whole, substantial evidence supports the ALJ's findings.

## 2.    The ALJ's Credibility Findings

Henderson complains that the ALJ's conclusion that her testimony was somewhat exaggerated (R. 376) and that "not totally credible" (R. 378) was "incomprehensible" given the medical record.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health & Human Serv.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

The ALJ found that Henderson's testimony was somewhat exaggerated when compared with the diagnostic and clinical findings. The ALJ specifically pointed to Henderson's allegation that she experiences vasospasms five of seven days that leave her completely non-functional, but the evidence shows that her medications are controlling her condition at least to some degree, and Dr. Parikh's credited opinion showed that she was able to walk, stand, or sit without restriction. R. 376. The ALJ

also discussed Henderson's claims of depression, but found that her depression is controlled and she is able to read, socialize with her fiends, add, subtract, follow complex information, and help her daughter with her homework.  *Id*.  The ALJ concluded based upon the definitive laboratory and clinical fmdings, Henderson's subjective complaints are beyond what would reasonably be expected in terms of intensity, duration, and frequency.  *Id*.

The ALJ has met the requirement of articulating specific and adequate reasons for discrediting Henderson's testimony.  The Court, therefore, may not disturb those findings.

**VI.**   **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk should enter a judgment in favor of the Commissioner and close the case.

**DONE AND ORDERED** on August 23, 2007.

*Donald P. Dietrich*

DONALD P. DIETRICH
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Beverly E. Williams, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817